## Stamps *v.* Bush.

By the statute of this state two verdicts are not a bar to the defendant's right to a new trial; although they may operate as a persuasive reason against a new trial.

Where a judgment of the court below refusing a new trial is brought up to the appellate court for review, under the statute, and testimony is set out in the record, the presumption will be, that it contains all the evidence adduced on the trial.

B. went to the house of S, to collect a bill of exchange. S. agreed to pay it in cotton, which B. agreed to receive: they went to gin and had seventy-three bales of cotton separated and removed from other bales. The bales thus separated were weighed, and their value calculated, which was within a small sum of the amount of the bill. The overseer was directed by S. to have the cotton hauled to the river, the plantation being on the river, for B.; but it did not appear that this transportation was any part of the contract. The gin, and all the cotton in it, were burned the night after the contract. Held; it was a constructive, if not actual delivery of the cotton, and was a good payment of the bill of exchange to the amount of the cotton.

Where there has been a constructive delivery of property, and the same is destroyed before an actual change of possession, the subsequent declarations of the parties will not change the legal effect of their contract, unless sufficient to amount to a discharge of the one previously entered into.

IN ERROR from the circuit court of the county of Wilkinson.

William S. Bush brought an action of assumpsit on a bill of exchange against William Stamps, who pleaded payment. On the first trial the jury could not agree. A second trial was had, and the plaintiff below obtained a verdict. A new trial was granted to the defendant, and the plaintiff recovered a second verdict. The defendant moved for a new trial, which was refused, and the defendant took his bill of exceptions and brought the case up in pursuance of the statute.

The defendant below set up a payment made in cotton, and proved by his overseer that Bush came to Stamps' house on the 22nd of January, 1838; that Stamps directed the witness to roll

cotton out of the gin, which was done, and the cotton weighed and a calculation made at thirteen cents a pound, which amounted to within about four dollars of the sum claimed by Bush on the bill of exchange; the quantity of cotton being seventy-three bales, which was separated and set apart from Stamps' cotton. After the cotton was rolled out and weighed, and the calculation made, Bush acknowledged payment of the amount of the bill except four dollars and a bit. After all this had been done, and about the time they were leaving the gin, Stamps told the witness to get a team and haul the cotton to the bank of the river for Bush. The gin and all the cotton was burned that night. Miss Spears was also examined, who stated that in January, 1838, Bush came to Stamps' house, on the Mississippi river, for the purpose of collecting a debt. She heard a conversation between them relative to the debt, and Bush agreed to take cotton, which was delivered to him, and burned on the same night. Stamps remarked to his wife, that he had paid Bush, to which Bush replied that he had paid him all but a few dollars, which amount they would settle in a treat when they met at Woodville. After the cotton was burned she heard Bush say it was his loss, and if it had not been his, the gin would not have been burned, stating that it was the third time he had been burned out. A witness was examined, who stated that next morning after the fire he heard Stamps say the loss was his. Another witness, three months afterwards, heard him say the loss was not Bush's, but his. Another witness in conversation with Stamps heard him say he had given Bush a draft on Natchez for fifteen hundred dollars, which had been sent up by Mr. Parker, and that if he would wait he would pay him the balance as soon as he could. Parker stated that Stamps gave him a draft to get cashed in Natchez, with directions to pay the money to Bush, but he failed to get it, and consequently did not pay Bush.

The bill of exceptions did not state that it contained all the evidence adduced on the trial of the cause.

C. P. Smith for plaintiff in error.

1. Anterior to the law of 1830, the authority of the circuit courts to award new trials was submitted to the discretion of the judge; whose decision was final as to the propriety or impropriety of

Stamps *v.* Bush.

granting or refusing a new trial. , But this discretionary authority of the circuit courts over the subject of new trials was regulated by precedent. It was a " sound legal discretion." It is to be presumed, therefore, in revising the decisions of the circuit courts on applications for new trials, that the appellate court will apply those rules, which the former profess to regard as obligatory in the exercise of this " discretion ; " and that applications for new trials must be considered as made in this court upon the state of facts presented to the consideration of the circuit judge. Nor should this position be held to conflict in any way with the admitted principle, " that the decision of every court is presumed to be correct, until the contrary is shown." It is true, that the judgment of the appellate court upon the propriety of the finding of the jury, incidentally involves the correctness of the decision of the court below on the motion for a new trial. But if that decision is to be regarded by this court as the criterion of its own judgment, or as argument in support of the verdict of the jury which is sought to be impugned ; the right of the plaintiff or appellant, to question the verdict or the decision of the circuit judge, on a motion for a new trial, is virtually annulled. It results then, that when the facts are fully presented in the record, the decision of the appellate court must be pronounced without reference to the determination of the circuit judge.

The whole of the testimony presented to the jury on the trial below is embodied in the record ; and we insist that their verdict is in opposition to the weight of evidence, and in palpable violation of the law arising on the facts established on the trial.

2. But before we examine the truth of either branch of the above proposition, we will notice an objection opposed *in limine*, which if valid will preclude inquiry as to the propriety of the verdict. It is this: " that according to the settled rule of practice, courts will not award a new trial after two concurring verdicts." We admit the rule, when "restricted to damages found by a second set of jurors on a mere question of fact." The essential character of a court of common law invests the judge with a supervisory jurisdiction over verdicts, and where they are obviously against the great weight of evidence, or where they are opposed to the law arising upon established facts, the court will set them aside, and

award new trials. This position is based upon the clearest dictates of policy and reason. Where the evidence greatly preponderates, the jury are bound by law to render their verdict in conformity thereto. And where they do not, but render their verdict in opposition to the evidence, it is manifest to the court that they have refused to exercise their appropriate and peculiar authority, the right to weigh the evidence. The reason is clearer when applied to verdicts against the law governing the facts established in the cause. If courts were divested of a supervisory jurisdiction over the subject of verdicts, there would be no longer any certainty in the law. " Principles the most firmly established might be overturned ; because a second jury were obstinate or rash enough to persevere in the errors of .the first, in a matter confessedly within the peculiar jurisdiction of the court ; that is, the construction of the law arising upon undisputed facts." We assume, then, the position as sustained by reason and by direct authority, in the cases of the Com. of Bucks county *v.* Ross, 3 Binney, 520 ; Moore's Administrators *v.* Cherry, 1 Bay's Rep. 269, and Goodwin *v.* Gibbons, 4 Burr. Rep. 2108 ; 1 Constitutional Rep. 328 ; that a new trial must depend upon answering the ends of justice, and "that the court is not bound by any rule of law, to give their sanction to a second verdict against the justice of the case, the evidence or the law."

3. We now propose to prove that the verdict of the jury in the case under consideration is against the great weight of evidence, and in direct opposition to the law, arising from facts established in the case, and about which there could be no dispute.

1. The only question before the jury was, whether the plaintiff in error had paid the bill of exchange recited in the defendant's declaration.

In proof of payment of that bill, the defendant below introduced the testimony of James B. Lucas, and the deposition of Harriet V. Speers. Miss Speers swears directly to the fact of the delivery of the cotton in payment of the debt from Stamps to Bush, and to the fact of acknowledgment by Bush that his demand had been satisfied, with the exception of the small sum of six dollars. The testimony of Miss Speers stands uncontradicted and unimpeached as to any fact deposed to by her, and is fully sustained by the tes-

timony of Jas. B. Lucas, which is also, as to any fact deposed to by him, uncontradicted by any direct or circumstantial evidence. But as the effect of the testimony of Lucas will, with greater propriety, be considered under the second branch of the exception to the verdict, we will remark, for the present, that it amounts to unequivocal proof of payment of the bill.

The rebutting testimony adduced by plaintiff below, does not, in the remotest degree, question any fact sworn to by Miss Speers or Lucas. The rehearsal by Eskew of the conversation with Stamps, is not connected with the count in Bush's declaration, based on the bill of exchange, but must refer to the claim for the price of the land. The testimony of Dongan, viewed in its most favorable aspect, for defendant in error, is only evidence of what Stamps may have thought, in a moment of deep affliction, as to the legal effect of the transactions deposed to by Lucas, upon the rights of the respective parties. His reply to Dongan cannot be tortured into a denial of any fact established by the testimony of Lucas. And the reply of Stamps to the question addressed to him by the witness Saunders, is conclusive to show that he thought himself legally discharged from all liability on the bill of exchange. But admitting, by way of argument, that Stamps's admissions to these three witnesses amounted to proof that he did not *think* the facts established by the testimony of Lucas constituted a delivery of the cotton to Bush, which was burned on the night after the sale, it cannot be maintained that his opinion could affect the *real* and *uncontested* state of facts, or divest him of rights actually acquired by the contract of sale between him and Bush. We assert, then, that the evidence of Miss Speers and Lucas, unquestionably establishing a sale and delivery of the cotton to Bush by Stamps, is uncontroverted by any evidence, either direct or circumstantial. That there was no confliction of evidence, in which case the jury might have weighed the testimony, and have decided according to the preponderance of the evidence. Regarded as a mere and naked question of fact, disconnected with any principle of law, upon which the court could have been required to decide, the finding of the jury presents one of those extraordinary cases of verdicts rendered against the "great weight of evidence," which demands the interposition of the court.

2. We insist that the verdict was rendered in direct and palpable opposition to the law, arising from established and unquestioned facts in the case.

Miss Speers states, in answer to the fourth interrogatory, that Capt. Bush came to the residence of Mr. Stamps on the river Mississippi for the purpose of collecting a debt from Mr. Stamps; Mr. Bush was to take cotton in payment of said debt; the cotton was delivered to him; and on the same night the cotton was burnt up. The agreement concerning the delivery of the cotton for said debt took place in January, 1838.

In answer to the fifth interrogatory, this witness says, she heard Capt. Bush say he "would receive cotton in payment of said debt." And in her answer to the sixth interrogatory, she says that she heard Capt. Bush remark "that he (Stamps) had paid him (Bush) all but a few dollars, (not more than six,) and that they would settle that amount in a treat," &c.

To tenth interrogatory witness answers, "she heard Capt. Bush say, after the gin and cotton were burnt, that the burning of the cotton which he had received from Stamps was his (Bush's) loss, and that if it had not been his (Bush's) cotton, the gin would not have been burnt."

James B. Lucas stated "that on the 22d of January, 1838, Wm. S. Bush came to the house of Stamps; that Stamps, in the presence of Bush, directed him (Lucas) to roll out of the gin cotton which was done, and the cotton was weighed, and the calculation at thirteen cents per pound was made, which amounted within four dollars and one bit of the amount claimed by Bush of Stamps at that time due on the bill of exchange sued on in this case, the quantity being seventy-three bales; that the cotton was separated and set apart from Stamps's cotton; that after the cotton was so separated, weighed and the calculation made, Bush acknowledged himself paid the bill of exchange all but four dollars and a bit; that when they were leaving the cotton, after all had been done as above stated, Stamps told Lucas to get a team and haul the cotton to the bank of the river for Bush; and that Stamps's gin and all the cotton was burnt that night."

These facts, evidenced by the concurring testimony of the said witnesses, must be held as unequivocally proven, as no evidence,

direct or indirect, was adduced which questioned even one statement of those witnesses. Leaving out of view the acknowledgment of Bush, in the presence of Miss Speers, that he had received the amount of his debt from Stamps, with the exception of a small sum, less than six dollars; and that her statement that Bush was to take cotton in payment of said debt; that the cotton was delivered to him, and on the same night the cotton was burnt up, referred to the same facts deposed to by the witness Lucas, we will consider the legal effect of this established state of facts upon the respective rights of Stamps and Bush in reference to the cotton.

We assume that the direct and unquestioned evidence of these two witnesses, proves a valid bargain and sale of the seventy-three bales of cotton from Stamps to Bush, in payment of Bush's demands.

I here remark that the 17th section, chap. 3, of the English statute of frauds and perjuries has not been adopted into our code. See this sec. of that statute, 1 Com. on Con., chap. 4, p. 47, and see the statute of frauds and perjuries of this state, Howard & Hutch. 370–1. The common law rule, therefore, as it existed prior to the adoption of the statute of 29th Charles II. must govern the case at bar.

But, admitting that the validity of a bargain and sale of goods is to be tested by the rules established under the 17th section of 29 Charles II., I assert that the right of property in the seventy-three bales of cotton was unconditionally vested in the defendant, Bush, and that, of consequence it was a complete payment of so much of the debt due by Stamps to said defendant. If the evidence above recited establishes either that the purchase money was paid for the cotton, or that there was a delivery made to the defendant, a present right of property attached in him, and the subsequent destruction of the cotton by fire was his loss and not that of the plaintiff. 2 Kent Com. 389.

1. There was full payment of the price agreed on by Bush. After the cotton had been weighed, separated from the remainder of the cotton of the plaintiff, and the calculation made of what the quantity so weighed and set apart would amount to at thirteen cents per pound, defendant admitted that he had received payment

of his demand, with the exception of four dollars and one bit. This must be conclusive of the question.

2. But there was not only a constructive but an actual delivery of the seventy-three bales of cotton. Even if the price had not been paid, a present right of property attached in Bush. "If goods are ordered in a shop, and left until they are called for, if they are weighed out or measured, it is a sufficient delivery." Elmore *v.* Stone, 1 Taunt. 459. If nothing remains to be done on the part of the seller, as between him and the buyer, before the commodity purchased is to be delivered, a complete present right of property has attached in the buyer. 6 East's Rep. 627; 2 Kent Com. 390. The same principle is recognized in the following cases: Whitehouse *v.* Frost, 12 East, 614; Jackson *v.* Anderson, 4 Taunt. 24; 11 East Rep. 210; Hind *v.* Whitehouse, 7 East, 558; *Ib.* 572; 11 John. Rep. 283; Henry *et al. v.* Mangles *et al.*, 1 Camp. 452; Philmore *v.* Barry, *Ib.* 513; 2 Campbell, 242.

In the case under consideration nothing remained to be done as between the plaintiff and defendant before the cotton was in a deliverable condition. It was separated, weighed out and set apart from the remainder of plaintiff's cotton, and the only possession and delivery which the character of the commodity admitted of was made and taken at the time. That the delivery was complete, if more conclusive proof could be adduced, is proved by the admission of the defendant that he had been paid. 2 Kent's Com. 393–4–5, and cases cited.

3. But we insist that, whatever might be the decision of this court upon the question, if the statute of 29 Charles II, chap. 3, sec. 17, were applicable, that there can be no doubt under the law of this state, that the testimony establishes a valid bargain and sale to Bush of the seventy-three bales of cotton.

The defendant, Bush, agreed to take cotton in payment of the bill of exchange sued on. In pursuance of this agreement, a sufficient quantity, at the price stipulated was weighed and set apart for him, and that thereupon he acknowledged himself paid. It will be borne in mind, that if there was neither an actual nor constructive delivery, nothing remained to be done as between Stamps and Bush before the commodity was to be delivered. In other words, it was susceptible of immediate delivery.

Stamps *v.* Bush.

A contract for sale and purchase, is an agreement for the conveyance of property to another, in consideration of an equivalent actually paid or intended to be given by the vendee. And where such a bargain is made for any specific commodity set apart and not intermixed with other goods, the property is changed immediately upon the making of the contract. 15 Peters Rep. 315. It is not the tender or delivery of the property, nor the payment of the purchase money, which constitutes a sale. The sale is complete so soon as the parties have agreed on the terms; that is, so soon as the vendee says, I will give the price demanded, and the vendor says, I will take it, the rights of both parties are instantly fixed. Porter *v.* Coward, Meigs's Rep. 2. If one sell me a horse for a valuable consideration, and the horse is to be delivered to me at a day certain, and by agreement a day is set for the payment of the money, or all or part of the money is paid in hand, or I take the horse by agreement into my possession where no money is paid, or day set apart for the payment, in either of these cases there is a good bargain and sale to alter the property thereof. Sheppard's Touchstone, 224. If I sell my horse for money, I may keep him until I am paid. But I cannot have an action until he be delivered; yet the property of the horse is in the buyer, and if the horse die in my stable between the bargain and delivery, I may have an action of debt for my money, because by the bargain the property was in the buyer. Noyes Max. 88; 2 Comyn on Con. 230; 2 John Rep. Lansing *et v.* 13.

The authorities which recite the common law rule in reference to the bargain and sale of personal property, conclusively establish the truth of the proposition, "that it is the proposal to sell and the agreement to buy at the stipulated price an article *in esse,* and susceptible of immediate delivery, which vests the property in the buyer, and not the payment of price, tender, or delivery of the goods." The evidence above recited shows that there was not only an offer to sell and an agreement to take the cotton at a stipulated price, but that it was specifically designated, separated from the remainder of the seller's cotton, and the price agreed on actually paid. There was no act or the slightest intimation of either party to this transaction, which could by any principle of reason authorize the assumption that any further act remained to be done

to complete the bargain and sale.   To apply a test, which must unerringly decide the question, let it be supposed that instead of the destruction of the cotton on that night, that it had not been removed by Bush on the succeeding day; that in the interim intelligence was received that this cotton was worth twenty cents per pound in market, and that in consequence of that intelligence Stamps had refused to allow the cotton to be removed, would not Bush's right to seize the cotton, or to recover its value in an action at law, have been unquestioned?   See the cases cited on the first branch of our exception to the verdict.

The jury must, therefore, have wilfully disregarded the law of the case, or have grossly erred in usurping the province of the court, by a most palpable misconstruction of the law, arising from the uncontested facts of the case.   If, therefore, this court shall refuse to reverse the decision of the circuit judge overruling the motion for a new trial, because a second jury were ignorant, obstinate, or rash enough to persevere in the errors of the former, on a matter confessedly within the peculiar jurisdiction of the court, deep injustice would be done to the plaintiff, principles the most firmly established overturned, and the law itself be rendered uncertain.

J. WALKER for defendant in error.

There was no witness present when the contract was made between Stamps and Bush, in relation to the cotton; but we insist that the jury had a right to infer from the circumstances that cotton was to be delivered by Stamps on the bank of the Mississippi river.   It was known that Stamps lived within a mile or two of the river, and could it be supposed that Bush intended hauling it home and then hauling it to the river again for shipment?   It is more reasonable to suppose that Stamps should by the agreement be required to haul it to the bank of the river for delivery to Bush, especially as the cotton was to be taken for Stamps' accommodation, instead of Bush's requiring the money; and the evidence of Lucas, Stamps' witness, tends to prove that it was to be delivered on the river bank, for he says, that upon weighing the cotton and rolling it out, Stamps told him to haul it to the river for Bush; and this may explain Stamps' admission that the cotton was his

Stamps *v.* Bush.

loss, and his endeavoring to pay Bush after the loss of the cotton. If the cotton, then, was to be delivered on the bank of the river, the sale was not complete till it was carried there.

But let this be as it may, there was no delivery proven. If it be said that Bush admitted that he was paid, let it be remembered that Stamps not only repeatedly said that he was not paid, but by his deliberate acts showed that he knew that Bush was not paid. If Bush's declaration that he was paid is evidence of the delivery and acceptance of the cotton, then Stamps' declaration that he was not paid is equally good evidence that it was not delivered; besides Bush's declaration that he was paid was made when the cotton was weighed and the amount calculated, and very probably was meant by him to admit that the amount of cotton was sufficient to pay, and was at all events entirely consistent with the idea that a delivery still had to take place, either at the gin or on the river.

Again: If it be said that Bush's admission that the loss was his, is proof of a delivery to bind him, we also say that Stamps' deliberate admissions that it was his (Stamps') loss, is equally good proof that it was not delivered, and then Stamps' acts some months after the accident, and when he knew the true facts of the case, is more satisfactory proof that it was not Bush's loss, and made the evidence preponderate in Bush's favor. But if this court should think that there was a preponderance of the evidence for Stamps, after he has had one new trial, this court will not again set aside the verdict. There must be the most gross injustice before this court would grant a new trial a second time. Even upon a first application, a new trial will not be granted merely because the verdict was found against the weight of evidence, if there was any evidence to sustain the verdict. See 3 How. Rep. 219; 2 Wendell, 352; 15 *Ib.* 48; 4 Yerger, 323; 10 Yerger, 501; 4 D. & E. 468; 1 Wilson, 22.

The case cannot be reversed, it is conceived, because the evidence nor no part thereof is brought before this court in the bill of exceptions filed by Stamps to the court overruling the motion for a new trial. See How. & Hutch. Dig. p. 493, sec. 52.

If the bill of exceptions had embodied the evidence stated on file, it is defective and insufficient, because it does not appear that

23*

either all the evidence given to the jury upon the trial, or the substance of the whole evidence that went to the jury, is put upon the record. It is consistent with the record to suppose that the jury had other evidence, not on record, before them on the trial.

MONTGOMERY & BOYD on the same side.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

Bush brought this action on a bill of exchange, and Stamps pleaded payment. On the first trial the jury could not agree, and there was a mistrial. A second trial was had, and the plaintiff below obtained a verdict. A new trial was granted, and the plaintiff obtained a second verdict, and the defendant moved for another new trial, which was refused; whereupon he excepted to the decision of the court.

The two verdicts may operate as a persuasive reason for refusing a third trial; but they are not a bar to the defendant's right to another trial. The statute declares that no more than two new trials shall be granted to the same party. We are not called on to say whether this statute would or would not, under all circumstances, compel the party to abide by the verdict on the second new trial, as there was but one new trial granted. On a complicated state of facts, a second verdict is justly entitled to great weight, and should stand, unless manifestly contrary to law. But in this case there is no dispute about facts, and we have only therefore to apply the law to the undisputed facts.

Before we proceed to determine whether the verdict is justified by this evidence, we must dispose of a preliminary question. Counsel for the defendant in error have insisted that as the bill of exceptions does not say this was all the evidence, we should presume that there was sufficient evidence to sustain the verdict, on the principle that a judgment must be presumed to be correct, unless the error is shown. We find this point already settled. In the case of Pickett *v.* Ford, 4 Howard, 246, the court said, "The statute requires that the substance of all the testimony given shall be incorporated in a bill of exceptions, which we must presume has been done. It was the right of the plaintiff, as well as the defendant, and also the duty of the court, to see that at least the

substance of all that was proved on the trial was inserted; and a question of this kind covering all the grounds urged in support of the motion below, could never be decided properly by the appellate court, on an imperfect or garbled statement of the evidence." This is also a bill of exceptions taken under the statute to the refusal to grant a new trial; and what was there said will apply here, and we must consequently suppose that at least the substance of the evidence *is* before us. It is not probable that either party would leave out any thing favorable, or that the court would be willing to have its judgment tried on a partial statement of the case. Supposing then that we have all the evidence, does it sustain the verdict?

In all cases of this description, in which the object is to ascertain who shall bear the loss of a chattel, the main point is to ascertain whether there has been an absolute and unconditional change of property? whether the entire right in the thing has passed from the vendor to the vendee? If it has, the vendee being the true owner, must bear the loss, unless there be a stipulation in the contract to the contrary. The question as to what will constitute such an actual unconditional change of property, has been the subject of many adjudged cases, as well as the subject of comment by elementary writers. Chancellor Kent gives us a correct understanding of what will constitute an absolute sale, in these words: "Where the terms of the sale are agreed on, and the bargain is struck, and every thing that the seller has to do with the goods is complete, the contract of sale becomes absolute, without actual payment or delivery, and the property and the risk of accident to the goods vest in the buyer. 2 Kent's Com. 492. This question was well considered in the case of Pleasants *v*. Pendleton, 6 Rand. 473. It was a contract for a certain quantity of flour, then in a warehouse. A bill of parcels or list specifying the mill brands, and the number of barrels of each brand, the total number of barrels, and the price per barrel, was exhibited to the purchaser, who agreed to buy. An order was given on the owner of the warehouse for the flour, and a bill was rendered for the amount purchased, and a receipt given for the money, which was paid by delivering a check on the bank. The seller had a large quantity of flour in the same warehouse. The flour sold was not separated from other flour.

It was not delivered; and that night the warehouse was burned. It will be seen that the two cases are very similar in their prominent facts, and the decision in the one case furnishes a precedent for the other. In deciding the case referred to, the court recognised these principles. That a constructive delivery was sufficient to put the risk on the buyer; that if the sale be complete, though the goods continue in the warehouse under an agreement to be free of storage, the vendee must bear the loss; that where the vendor has no further act to do, to ascertain the quantity, quality, or price of the article sold, the vendee must bear a loss occurring by fire. The court distinguished it from cases of a like kind, where something remained to be done by the vendor, and held that as nothing remained to be done by him, the sale was complete, and the purchaser must bear the loss.

It is no doubt a correct position, that such a delivery as will vest the property absolutely in the vendee, would also be a sufficient delivery within the statute of frauds ; we may therefore refer to some of the English decisions under that statute, as authorities on the present question. In the case of Hodgson *v.* Le Bret, 1 Campbell, 233, the defendant agreed to purchase a piece of Irish linen, and wrote her name on it, but left it with the shopkeeper without any directions, and this was held to be a sufficient delivery. In the case of Anderson *v.* Scott, *id.* 235, note, the action was for the non-delivery of wine. The plaintiff went into defendant's wine cellar and selected several pipes of wine, for which he agreed by parol to pay a certain price; the spills or pegs by which the wine is tasted, were then cut off, and the plaintiff's initials marked on the casks by the clerk, and the plaintiff took the numbers. Lord Ellenborough held this a sufficient delivery to change the property. When goods are ponderous, and incapable of being handed over, there need not be an actual delivery, but any thing which is tantamount will answer, *id.* 236, note. In the case of Elmore *v.* Stone, 1 Taunton, 458, the defendant went to the plaintiff's stable for the purpose of purchasing two horses ; the plaintiff fixed a price, which defendant refused to give, but afterwards sent word that he would take them, but the plaintiff must keep them at livery for him, and this was held by Lord Mansfield to be a sufficient constructive delivery to pass the property. The

case of Smith *v.* Nevett, Walker's Rep. 370, is an authority in point. The subject of the suit was a cotton gin, for which the money had been paid, and it was held that a constructive delivery was sufficient. The property was held to have passed, because nothing remained to be done by the vendor.

When we apply the principles of these decisions to the facts of this case, we find that an unqualified change of property in the cotton took place. Bush came to Stamps' house for the purpose of collecting the amount of a bill of exchange. Stamps agreed to pay it in cotton, which Bush agreed to receive. They went to the gin and had seventy-three bales of cotton rolled out and separated from other bales. The seventy-three bales were weighed, and their value calculated at thirteen cents per pound, and the amount was within a few dollars of the amount of the bill, and the overseer was directed to have it hauled to the river bank, (the plantation being on the river,) for Mr. Bush. No money was paid, because the cotton itself was but a payment. In principle it is precisely the same as if the money had been paid by Bush. The cotton was weighed, and set apart, and the calculation made, and Bush acknowledged that he was paid, except a few dollars. Nothing then remained to be done by Stamps. The terms of the sale had been agreed on, and the bargain struck, and the thing identified and removed from its place of deposit. The only circumstance which is in the least calculated to create any doubt, is that Stamps directed his overseer to have it hauled to the river bank. This seems to have been a mere gratuitous offer. The contract contained no stipulation of this sort, and we cannot presume that it was a part of the contract, and therefore a thing to be performed by Stamps. The previous acts of themselves amounted to at least a constructive delivery ; perhaps to an actual delivery. Cotton in bale is a cumbrous article, incapable of being handed over. In contracting to sell cotton, it would be understood to be deliverable at the seller's gin, unless otherwise agreed. No presumption can therefore arise that a delivery elsewhere was a part of this contract. This was probably regarded by both parties as an immaterial matter, as the plantation is on the river, and at all events it can have no weight. The contract was complete without it.

The subsequent declarations of the parties, could not alter the

legal effect of their contract, unless they had been sufficient to amount to a new obligation, or a discharge of a previous one. Their rights, however, in this respect are balanced ; each having acknowledged the loss to be his. Altogether, as the case is presented to us, the law seems to be sufficiently with the plaintiff in error to entitle him to a new trial. On another trial the case may be susceptible of such an explanation as will induce the jury to give another verdict in the same way, and if so, it will no doubt be more satisfactory to the parties.

New trial granted.